**In re CENDANT CORPORATION LITIGATION.**

No. CIV.A. 98–1664.

United States District Court,
D. New Jersey.

Sept. 8, 1998.

Andrew L. Barroway, Schiffrin Craig & Barroway, LLP, Bala Cynwyd, PA.

Jill S. Abrams, Abbey, Gardy & Squitieri, LLP, New York, NY.

Leonard Barrack, Barrack Rodos & Bacine, Philadelphia, PA.

Samuel P. Sporn, Schoengold & Sporn, P.C., New York, NY.

Daniel J. Beller, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY.

Max W. Berger, Bernstein Litowitz Berger & Grossmann, LLP, New York, NY.

Stanley D. Bernstein, Bernstein Liebhard & Lifshitz, New York, NY.

John J. Barry, Barry & McMoran, Newark, NJ.

Robert G. Finkel, WolfPopper, LLP, New York, NY.

John Halebian, Wechsler Harwood Halebian & Feffer, LLP, New York, NY.

Allyn Z. Lite, Goldstein Lite & DePalma, Newark, NJ.

Neil L. Selinger, Lowey Dannenberg, Bemporad & Selinger, PC, White Plains, NY.

Roger W. Kirby, Kaufman Malchman Kirby & Squire, New York, NY.

Patricia M. Hynes, Milberg Weiss Bershad Hynes & Lerach, New York, NY.

Kari Neuwelt, New York, NY.

Peter S. Pearlman, Cohn Lifland Pearlman Herrmann & Knopf, LLP, Saddle Brook, NJ.

Jeffrey C. Zwerling, Zwerling, Schachter & Zwerling, LLP, New York, NY.

Michael S. Etkin, Ravin, Sarasohn, Cook, Baumgarten, Fisch & Rosen, PC, Roseland, NJ.

Sherrie R. Savett, Berger & Montangue, P.C., Philadelphia, PA.

Stanley Grossman, Pomerantz Haudek Block & Grossman, New York, NY.

Mark C. Rifkin, Greenfield & Rifkin, LLP, Ardmore, PA.

Stephan D. Oestreich, WolfPopper, LLP, New York, NY.

Steven Pasternak, Pasternak Feldman & Plutnick, PA, Livingston, NJ.

David Grossman, Schneider Goldberger Cohen Finn, Solomon Leder & Montalbano, Kenilworth, NJ.

Donald King, Bross Zipkin & Pinilis, LLP, Newark, NJ.

Robert N. Kaplan, Kaplan Kilsheimer & Fox, LLP, New York, NY.

Oren Giskan, James V. Bashian, New York, NY.

Harold Sirota, Sirota & Sirota, Maplewood, NJ.

Jeffrey S. Abraham, New York, NY.

Dan Costell, Porter, Wright, Morris & Arthur, Columbus, OH.

Richard M. Conley, Archer & Geiner, Princeton, NJ.

Steven E. Fineman, Lieff, Cabraser, Heimann & Bernstein, New York, NY.

WALLS, District Judge.

The 1995 Private Securities Litigation Reform Act ("PSLRA" or "Reform Act") was enacted by Congress to curb perceived abuses in the litigation process—widespread initiation and manipulation—of securities class-actions by "professional" plaintiffs and lawyers. Acknowledging the value of private securities litigation, *see Gluck v. Cellstar Corp.*, 976 F.Supp. 542, 544 (N.D.Tex.1997), Congress also recognized that under the prior regime, "[c]ourts traditionally appoint[ed] lead plaintiff and lead counsel in class action lawsuits on a first come, first serve basis." S.Rep. No. 104–98 (1995) reprinted in U.S.C.C.A.N. 679. This encouraged a "race to the courthouse" among parties seeking lead-plaintiff status and spawned a cottage-industry of specialized securities litigation firms that "researched potential targets for these suits, enlisted plaintiffs, controlled the course of the litigation, and often negotiated settlements that resulted in huge profits for the law firms with only marginal recovery for the shareholders." *Gluck*, 976 F.Supp. at 544 (citing S.Rep. No. 104–98 at 687)

To stem this unhealthy trend, the Reform Act establishes a presumption that among the parties seeking to lead the class, the persons or group of persons with "the largest financial interest in the relief sought by the class" is the "most adequate plaintiff" to do so. 15 U.S.C. § 77z–1(a)(3)(B)(iii)(I) [1]. That plaintiff then selects counsel to represent the class. 15 U.S.C. § 77z–1(a)(3)(B)(v). The goal of this scheme is to "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." H.R.Rep. No. 104–369 at 32 (1995) reprinted in 1996 U.S.C.C.A.N. at 731. Its underlying assumption is that the plaintiff or plaintiff group with the strongest financial interest will pursue the claims with the greatest vigor and will have both the interest

---

1. For the sake of brevity, this opinion shall refer to the relevant Reform Act amendments to the Securities Act of 1933. The corresponding amendments to the Securities Exchange Act of 1934 are found at 15 U.S.C. § 78u–4.

and the clout to engage qualified counsel at the best rates for the class. The court is then charged with ensuring that the reality of the case accords with these assumptions. Thus, the lead plaintiff presumption is rebuttable, 15 U.S.C. § 77z–1(a)(3)(B)(iii)(I), and that party's selection of counsel subject to court approval. 15 U.S.C. § 77z–1(a)(3)(B)(v).

This matter comes before the Court by the motions of fifteen plaintiffs or plaintiff groups for appointment as lead plaintiff in this shareholder class action. Each movant also seeks to have its chosen attorneys selected as lead counsel, and some motions were made for appointment of liaison counsel. The Court heard oral argument on this matter on August 4, 1998.[2] For the reasons that follow, the Court designates Welch & Forbes as lead plaintiff for the claims filed on behalf of the holders of "Feline Prides" derivative products, and the Public Pension Fund Investors as lead plaintiffs for the claims of all other shareholders. Lead counsel shall be determined through a process of competitive bidding, after which each lead plaintiff's present counsel, if a participant in the bidding and otherwise qualified, shall be afforded the opportunity to meet the lowest bids on their respective claims. The motion for appointment of liaison counsel is denied.

### Background

Defendant Cendant Corporation is one of the world's largest providers of consumer and business services. Among other things, the company provides access shopping, automobile and dining services, mortgage services and real estate brokerage services. Cendant was formed on or about December 18, 1997 when its predecessor, CUC International, Inc. ("CUC") merged with HFS, Inc. Under the terms of the merger, all outstanding shares of HFS common stock were exchanged for CUC shares and the merged entity took the name "Cendant."

On April 15, 1998, after the stock market closed, Cendant announced that it had uncovered substantial accounting irregularities in a former CUC business unit—now part of the merged entity. As a result of this revelation, the company announced that it would have to restate its reported annual and quarterly net income and earnings per share for 1997 and possibly for earlier periods as well. The

market reacted to the news with predictable disfavor. On the day after the announcement, Cendant's stock price plummeted 46 percent. In the ensuing days, a flurry of shareholder suits were filed in this and other districts against Cendant, its directors, and various other relevant parties. To date, there are upwards of 64 such actions. With the exception of the single shareholder derivative action, the cases either have been or are in the process of being consolidated.

Plaintiffs in the various actions fall into one or more of four categories: (1) former holders of CUC shares; (2) former holders of HFS stock; (3) purchasers of Cendant stock; and (4) holders of Feline Prides ("Prides")—a derivative security based on Cendant common stock. All of the actions sound in fraud. The Prides-holders, who purchased the security pursuant to a registration statement and prospectus, allege violations of Sections 11, 12(a)(2), 15 and 22 of the Securities Act of 1933 (the "Securities Act" or "'33 Act"). Shareholders of Cendant common stock, having acquired their holdings both on the open market as well as pursuant to the Joint Proxy Statement/Prospectus of CUC and HFS, charge defendants with violations of Sections 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act" or "'34 Act") and violations of Sections 11, 12, 15 and 22 of the '33 Act. Fifteen plaintiffs or groups of plaintiffs filed motions for appointment as lead plaintiff. Each movant also sought to have its attorney or attorneys selected as lead counsel for the class.

### Discussion

#### I. Selection of Lead Plaintiff

■ The PSLRA instructs the Court to "appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of the class members." 15 U.S.C. § 77z–1(a)(3)(B)(i). To this end, the statute sets forth

> a presumption that the most adequate plaintiff in an private action arising under this subchapter is the person or group of persons that—
>
> (aa) has either filed the complaint or made a motion in response to a notice under

---

2. On August 24, 1998, the Court entertained additional argument and modified its initial holding

on the basis of the new evidence presented. *See infra*, fn. 5.

subparagraph (A)(i);[3]

    (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

    (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 77z–1(a)(3)(B)(iii)(I). It further provides that

[t]he presumption described in subclause (I) may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—

    (aa) will not fairly and adequately protect the interests of the class; or

    (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

15 U.S.C. § 77z–1(a)(3)(B)(iii)(II).

At the outset, none of the movants knew the extent of any of the other plaintiff's or group of plaintiffs' financial interest in the litigation. Consequently, each applicant's moving brief consisted primarily of a statement that it had complied with the procedural requirements of the statute and an assertion that that plaintiff or amalgamation of plaintiffs was most adequate to lead because of the losses it had incurred. While most of the applicants quantified their losses, some simply relied on the assertion that they were most qualified. One movant's claims clearly stood out.

The "Public Pension Fund Investors," or "CalPERS group," formed from the California Public Employees' Retirement System ("CalPERS"), the New York State Common Retirement Fund ("CRF") and the New York City Pension Funds ("NYCPF") alleged combined losses in excess of $89 million. This dwarfed the next largest claim of $10.6 million asserted by the State Teachers Retirement System of Ohio, the City of Philadelphia and various individual plaintiffs ("The Ohio/Philadelphia Group"). Because the Public Pension Fund Investors had invested in each of the four types of securities at issue, the other movants could not rightly challenge the typicality of its claims. *See Gluck,* 976 F.Supp. at 546 (applicant for lead plaintiff status need only make a preliminary showing that it satisfies the requirements of Rule 23). Competing movants responded to the CalPERS group's motion either by seeking appointment as co-lead plaintiff on the ground that the Public Pension Fund Investors could not adequately represent the entire class alone, or by attempting to rebut the statutory presumption that the CalPERS group was most adequate to lead.

### a. Propriety of Appointing Co–Lead Plaintiff(s)

Notwithstanding the diversity of the CalPERS group's holdings, nine movants petitioned the Court for appointment as co-lead plaintiff. While some offered little more than the general assertion that diversity of representation would benefit the class, others endeavored to challenge the typicality and adequacy of the CalPERS group's claims. None, it should be noted, purported to rebut directly the presumption that the Public Pension Fund Investors were the most adequate lead plaintiffs. Instead, each attempted to distinguish its interests from those of the CalPERS group in an effort to justify broader representation among the lead plaintiffs.

One movant, for example, asserted that it should have a voice because it had suffered the largest losses of any *private* investor and argued that it would have a stronger incentive than the CalPERS group to pursue this action zealously because its losses were greater in proportion to its total assets. Others maintained that *individual* investors should be represented among the lead plaintiffs because large institutions might be unduly concerned with potential disruption of valuable business relations with certain defendants. Still another group asserted that options-holders should be explicitly represented because their interests might, at some point in the litigation, diverge from those of the other shareholders.

Several movants charged that the Public Pension Fund Investors were ill suited to pursue claims based on Prides as well as the claims of common stockholders. Some warned that the CalPERS group, having incurred a substantial proportion of its losses as a result of its open-market purchases, would be motivated to "tilt" the litigation in favor of recovery on the '34 Act claims. Others maintained that the CalPERS group—

---

**3.** Under the statute, plaintiffs must publicize the pendency of the action within 20 days of the filing of the complaint. 15 U.S.C.A. § 77z– 1(a)(3)(A)(i). Within 60 days of such publication, any member of the purported class may then petition the court to serve as lead plaintiffs. *Id.*

and other public pension fund plaintiffs—by virtue of their size and investment activity, had developed "special relationships" with underwriters that would create a disincentive to pursue certain avenues of recovery available only to Prides-holders. Finally, some movants asserted that additional lead plaintiffs were warranted in this case because additional attorneys would be better able to advance the potentially high costs and expenses of litigating this action. While all of these arguments raised valid concerns, none was persuasive.

More likely than not, the putative class in any large shareholder action will be composed of plaintiffs whose portfolios differ in composition from one another. This, however, does not justify the appointment of potentially innumerable co-lead plaintiffs to ensure that each individualized interest is represented. Competing movants may be correct that the resolution of this case could ultimately favor holders of one type of security over the others. On the other hand, representation by a disparate group of plaintiffs, each seeking only the protection of its own interests, could well hamper the force and focus of the litigation. A balance must be struck.

The Reform Act demands only that the interests of the class members be *adequately* represented by the lead plaintiff. 15 U.S.C. § 77z–1(a)(3)(B)(i). Thus, notwithstanding every plaintiff's undeniable interest in an outcome most favorable to his or her position, every warrior in this battle cannot be a general. Absent a showing sufficient to rebut the CalPERS group's presumption of adequacy, what matters here is that the claims of every member or constituent group of the putative class arise from the same false or allegedly fraudulent representations of CUC. The Public Pension Fund Investors have significant holdings in each type of security held by the putative plaintiff class and have suffered enormous losses. It is unrealistic to assume that they would not travel every avenue that could potentially enhance their potential recovery. And in pursuit of their interests, the Public Pension Fund Investors will necessarily seek to establish the elements of every plaintiff's claim. Under these circumstances, such self-interest of the pre-

sumptive lead plaintiffs will ensure adequacy of representation for all the class.[4] *See also Gluck,* 976 F.Supp. at 547–48 (dismissing speculative challenges to adequacy and typicality for similar reasons.) Moreover, "separate proceedings can, if necessary, be held on individualized issues.... Rule 23(a) does not require that class members share every factual and legal predicate to meet the commonality and typicality standards." *In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liability Litig.,* 55 F.3d 768, 817 (3d Cir.1995) (hereinafter *"General Motors"); see also In re Prudential Ins. Co. America Sales Practices Litig. Agent Actions,* 148 F.3d 283, 309–11 (3d Cir.1998).

Finally, the argument that additional plaintiffs bring to the litigation other counsel capable of advancing additional funds is based upon the mistaken assumption that lead plaintiff comes inextricably tied to its counsel. As will be discussed, this is not necessarily so. A particular law firm's ability to sustain the action goes to its qualifications as lead counsel; it has no bearing on which or how many of the plaintiffs shall lead the charge. Accordingly, all motions for appointment as co-lead plaintiff that do not challenge the Public Pension Fund Investors' statutory presumption of adequacy are denied.

### b. Attempts to Rebut the Presumption

#### i. *Counsel considerations*

Plaintiffs Joanne A. Aboff Family Trust and Douglas Wilson ("Aboff and Wilson") challenged the adequacy of the CalPERS group because of its selection of counsel. Aboff and Wilson first argued that they were better suited to lead than the CalPERS group because they had negotiated a reduced fee schedule with their attorneys. They asserted that their lower counsel costs rebutted the statutory presumption in favor of the Public Pension Fund Investors since it would result in a greater percentage of any recovery accruing to the class.

■ Aboff and Wilson further argued that scrutiny of counsel arrangements was particularly important here because considerations other than the interests of the class might have influenced the CalPERS group when it retained its attorneys. Specifically, these plaintiffs charged that counsel for the Cal-

---

4. This determination is, of course, made without prejudice to plaintiffs' ability to later move for

the creation of appropriate sub-classes pursuant to Fed.R.Civ.P. 23(c)(4)(B).

PERS group had made substantial contributions to the campaign of the New York State Comptroller, who, as sole trustee of the CRF, has substantial influence over the decisions of the fund. This, they argued, created an appearance of impropriety because the contributions may have played a role in the selection of the group's counsel—a practice known as "pay-to-play." Finally, if their reduced fee arrangement was not sufficient to rebut the presumption and justify their appointment as lead plaintiffs, Aboff and Wilson urged that the Court should select lead plaintiff through a process of competitive bidding.

While all of these arguments were interesting, none was grounded in the statutory language. The Reform Act is clear that the lead plaintiff presumption can be rebutted "*only* upon proof ... that the presumptively most adequate plaintiff ... will not fairly and adequately protect the interests of the class; or is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. §§ 77z–1(a)(3)(B)(iii)(II)(aa), (bb) (emphasis added). Aboff and Wilson's speculative assertions provided neither.

First, the Court notes that favorable attorneys' fees are but one of a number of important class interests that must be pursued by lead plaintiffs. Indeed, one of the assumptions underlying the Reform Act's presumption of adequacy is that plaintiffs with the assets necessary to have made large investments will also be able to negotiate the most advantageous counsel rates to the class. Yet the rationale for the statutory presumption extends further.

Simply put, the party with the largest financial interest in the litigation has the most to gain from any marginal increase in dollars recovered per share. In this case, it is not lost on the Court that Aboff and Wilson did not, until pressed by the Court, reveal that they had sustained losses of only about $100,000. The reason is clear. In terms of sheer dollar amounts, any recovery, good or bad, will be felt almost 900 times as strongly by the CalPERS group as it will by Aboff and Wilson. Who has the greater incentive to pursue the most favorable end to this action?

Speculative allegations of pay-to-play were similarly unimpressive. Questioned at oral argument, Aboff & Wilson admitted that the campaign contributions against which they railed were violative of no New York law or any other law. Asked if they could present any proof of wrongdoing by the CalPERS group or its attorneys, Aboff and Wilson admitted that they could not. Thus, given the opportunity to "put up or shut up," where the statute clearly requires the former, Aboff and Wilson chose the latter. Their argument is dismissed.

Finally, while the Court was attentive to the suggestion that lead plaintiff be selected through a process of competitive bidding based on attorneys fees, it notes that the PSLRA permits no such thing. Because Congress has now decreed that certain facets of the litigation be given paramount consideration, that tail can no longer wag this dog.

ii. *Conflicts of Interest*

■ In the end, only one movant was successful—partially—in rebutting the statutory presumption of adequacy. Plaintiff Welch & Forbes, present in this case because of substantial Prides-related losses, claimed that Merrill Lynch, as underwriter of the Prides offering, would be a necessary defendant in any action on behalf of Prides holders. It further charged that the Public Pension Fund Investors hold combined investments in Merrill Lynch in excess of $300,000,000—a figure several times greater than the $6,400,000 they allege to have lost in their Prides—and could not be expected to pursue vigorously recovery from that defendant.

Offered the opportunity at oral argument, the attorneys for the CalPERS group did not deny this overwhelming financial interest in a potential defendant. Though they publicly (and theatrically) pledged to the Court and gallery to pursue any and all viable claims against Merrill Lynch, logic and simple mathematics speak louder. The Court simply does not believe nor find that the CalPERS group can overcome this substantial conflict of interest and fully protect the interests of the Prides-holders. Because of this infirmity, the Court appoints the CalPERS group as lead plaintiffs for all matters save those involving Prides securities. Welch &

Forbes, the non-conflicted party[5] with the next largest holdings of Prides is appointed colead plaintiff to pursue all claims based on that security. This selection of lead plaintiffs is made without prejudice to any party who seeks to contest such designation at the time of the motion for class certification.

## II. *Selection of Lead Counsel*

■ The Reform Act instructs that "[t]he most adequate lead plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 77z–1(a)(3)(B)(v). In contrast to the strictly defined procedures and considerations that prescribe the determination of lead plaintiff, here the Court's approval is subject to its discretionary judgment that lead plaintiff's choice of representative best suits the needs of the class.[6]

It is reasonable to assume that given the opportunity, absent class members would try to secure the most qualified representation at the lowest cost. As one court has noted, "the ultimate goal in class action litigation—that is, for the members of the plaintiff class—is to maximize the benefit to the class members if the litigation proves successful (either by way of settlement or through trial), and there can be no doubt that the class is best served by obtaining highly qualified class counsel who are prepared to undertake the representation on a basis that will maximize that recovery (something that necessarily implicates what counsel will charge for their services)." *Raftery v. Mercury Finance Co.,* 1997 WL 529553 (N.D.Ill. Aug. 15, 1997).

The PSLRA attempts to protect the class by instructing that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." 15 U.S.C. § 77z–1(a)(6).[7] But as the *Raftery* court rightly wrote, reliance on this provision presupposes "that the court will be able to divine the reasonable value of the services rendered when the time

comes, a false presupposition." 1997 WL 529553 at *2. It is no insult to the judiciary to admit that a court's expertise is rarely at its most formidable in the evaluation of counsel fees; judges rarely retain counsel. And even though a lead plaintiff presumed to have identity of interests with the rest of the class might also be presumed to be motivated by appropriate price and quality considerations, the statutory requirement that lead plaintiff's selection is subject to court approval, indicates that the Court should not rely solely on that party's judgment. There are other mechanisms to aid the Court.

There is an emerging trend in common fund class actions for courts to simulate the free market in the selection of class counsel. The use of an auction to select counsel in a securities class action was pioneered by District Judge Vaughn Walker's insightful and innovative opinions which directed the *In re Oracle Securities Litigation,* 131 F.R.D. 688 (N.D.Ca.1990), 132 F.R.D. 538 (1990) and 136 F.R.D. 639 (1991). Those decisions, and those that followed Judge Walker's lead, sought to provide a framework for reasonable counsel fees and costs which are to be borne by all plaintiffs in the event of recovery. *See Oracle,* 131 F.R.D. at 692 ("the problem facing the court is how to approximate what the class members would do if they were involved in the decision-making"); *In re Amino Acid Lysine Antitrust Litig.,* 918 F.Supp. 1190, 1194 (N.D.Ill.1996) ("The object ... is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible.... [T]o simulate the market where a direct market determination is infeasible."); *Raftery,* 1997 WL 529553. These courts have recognized that the most effective way to establish reasonable attorney fees is through marketplace (which this Court terms, adversarial) competition. This Court shares their resolve. Its rationale is simple and flows from the tradition of the profession.

---

5. At the initial hearing, the Court selected the group led by the State of Connecticut Retirement Plans and Trust Funds to lead the Prides claims because after the CalPERS group, it had suffered the next largest losses based on Prides. At the August 24th reargument, that plaintiff was removed as lead plaintiff when the Court was made aware that Connecticut, too, had holdings in Merrill Lynch far in excess of its Prides losses.

6. In common fund class actions, the Court takes on fiduciary duties to the class. *See Oracle,* 131 F.R.D. at 691.

7. *See also* Fed.R.Civ.P. 23(e) ("A class action shall not be dismissed or compromised without the approval of the court ...").

The task of lead counsel carries substantial responsibility. Lead counsel must represent not only the interests of a lead plaintiff, but all members of the putative class. It follows then that such responsibility should be borne by counsel of the highest professional talent, accompanied by a similarly high degree of integrity. Such talents have been developed and manifested in this type of litigation. Such qualities, per force have been hewn by the adversarial foundation of our trial system. To seek the requisite reasonableness of costs for such talent which are to be borne by the entire plaintiff group in the event of recovery, it is the Court's judgment that legal fees also be the subject of adversarial competition.

The Court shall conduct an auction to determine the lowest qualified bidder to represent the class as counsel. Any attorney or attorneys interested in serving as counsel to either of the two lead plaintiffs shall submit a sealed bid to the Court not later than 4:00 p.m., September 17, 1998 E.D.T.:

1. Each bidder shall submit his, her, or their professional qualifications to be lead counsel. Among anything else deemed relevant, this shall include a history of involvement in similar litigation, case titles, docket numbers, relevant dates, courts involved, the result, whether by trial or appeal, settlement or resolution and the time during litigation when such resolution or settlement occurred.

2. Bidders shall indicate their ability to undertake and maintain all costs of this litigation, and should express their readiness to post a performance bond and its amount, if required by the Court.

3. Bidders shall indicate how costs are to be deducted in the event of resolution favorable to the plaintiffs.

4. Applicants shall state their percentage fee bids according to one or both of the following "litigation milepost" grids: [8]

5. Each bidder shall certify that its bid is made in good faith and has been formulated, determined, prepared and forwarded to the Court without any assistance, revelation or collusion, direct or indirect, with any other party or competing law firm before submission to the Court.

6. Payment of the fees and costs of any lawyers or firms assisting the lead counsel, if any, will be the responsibility of lead counsel.

7. The Court reserves the right to reject any and all bids it deems not to have been made in good faith or which are contrary to the interests of the consolidated plaintiffs. In its discretion, the Court may solicit additional bids from any source.

Recognizing that the Reform Act affords an opportunity to lead plaintiffs to choose counsel subject to the approval of the Court, the Court maintains the same in the auction process. Upon determination of the lowest qualified bidder by the Court, if present counsel to a designated lead plaintiff is the lowest qualified bidder, that person or entity will be appointed by the Court. If not, that person or entity, if otherwise qualified, will have the opportunity to agree to the terms of what the Court has found to be the lowest qualified bid. If that person or entity accepts those terms, lead counsel status will be conferred upon it by the Court. If counsel does not exercise this right of first refusal, the lowest qualified bidder will serve the plaintiffs.

As mentioned, the Court acknowledges lead plaintiffs' statutory opportunity. However, whether under the present statute or earlier discipline, the Court is the final arbiter of fees sought by successful plaintiffs' lawyers in this action. *See* F.R.Civ.P. 23(e); 15 U.S.C. § 77z–1(a)(6). The mechanism of an auction gives to the Court a measure of needed foresight to meet its obligations to members of the group. The Court need not be compelled to learn by hindsight—to be told at the end of months or years of litigation, "this is what we seek for services *rendered."*

The Court is required to protect the interests of all members of the class. If Congress had intended otherwise with its PSLRA, it could have easily permitted lead plaintiff to designate and retain counsel without judicial approval. It did not.

---

8. Applicants may, of course, bid on both available positions. However, for obvious reasons, if one firm emerges as lowest qualified bidder for both lead plaintiffs, it shall be forced to choose. The remaining position shall go to the firm submitting the next lowest qualified bid.

The auction will not obviate the Court's final review of fees and costs pursuant to Rule 23(e), *see e.g. In re General Motors,* 55 F.3d at 819 ("a thorough judicial review of fee applications is required in all class action settlements"), and/or 15 U.S.C. § 77z–1(a)(6) if this matter is ultimately resolved in favor of the putative class. During the requisite post-resolution evaluation, the results of the auction will serve as a benchmark of reasonableness.

This is not an invitation for cheapness of costs resulting from cheapness of quality. The Court is confident that professional skills of high order will be forthcoming by this procedure. Additionally, notwithstanding the absence of proof of pay-to-play, the auction is salutary because it removes any speculative doubt about that issue.

### III. *Necessity for Liaison Counsel*

The chief applicant for appointment as liaison counsel asserted that he would play an integral role in this action, advising lead counsel on local procedural matters, coordinating administrative matters, distributing communications between the Court and other counsel, convening meetings of counsel and advising parties of developments in the case. Qualified lead counsel will be surely capable of performing these ministerial tasks. The Court finds no need to involve another law firm in this matter. Accordingly, all motions for appointment of liaison counsel are denied.