SHERLEIGH ASSOCIATES LLC and Sherleigh Associates Inc. Profit Sharing Plan, on behalf of itself and all others similarly situated, Plaintiffs,

v.

WINDMERE–DURABLE HOLDINGS, INC., David M. Friedson, Harry D. Schulman and Nationsbanc Montgomery Securities LLC, Defendants.

No. 98–2273–CIV.

United States District Court, S.D. Florida.

March 9, 1999.

Order Correcting Opinion on Denial of Reconsideration March 16, 1999.

Jeffrey A. Klafter, Bernstein Litowitz et al., Mark C. Gardy, Abbey Gardy et al., Jules Brody, Stull Stull et al., Curtis V. Trinko, Law Office of Curtis V. Trinko, Steven G. Schulman, Samuel H. Rudman, Milberg Weiss et al, Stanley M. Grossman, Pomerantz Haudek et al., Vincent Capucci, Entwistle & Capucci, New York City, Michael J. Pucillo, Burt & Pucillo LLP, W. Palm Beach, FL, Kenneth Vinale, Millberg Weiss et al., Boca Raton, FL, Steven Toll, Cohen Milstein et al., Seattle, WA, Robert Gilbert, Coral Gables, FL, Jeffrey C. Block, Berman DeValerio et al., Boston, MA, Michael Criden, Hanzman Criden et al., Miami, FL, Peter Rachman, Goodknd Labaton et al., Ft. Lauderdale, FL, for Plaintiffs.

Alan Mansfield, Greenberg Traurig, New York City, Richard G. Garrett, Greenberg Traurig, Miami, FL, for Defendants Windmere–Durable Holdings, Inc., David M. Friedson, Harry D. Schulman.

Gregory A. Markel, Brobeck, Phleger & Harrison, New York City, Parker Thomson, Thomson Muraro et al., Miami, FL, for Defendant NationsBanc Montgomery Securities LLC.

### OMNIBUS ORDER CONSOLIDATING CASES; DIRECTING ALL INTERESTED PERSONS TO SUBMIT BIDS FOR DESIGNATION AS LEAD PLAINTIFFS' COUNSEL; PROVISIONALLY CERTIFYING LEAD PLAINTIFF; PROVISIONALLY CERTIFYING CLASS; AND STAYING ALL DISCOVERY AND SCHEDULING REQUIREMENTS

LENARD, District Judge.

**THIS CAUSE** is before the Court on motions for consolidation, filed in this case and

various related cases. This putative class action was filed on September 29, 1998 and was transferred to this Court by Order of the clerk on January 8, 1999. On January 20, 1999, the Court directed the Defendants to file a status report, as it was still uncertain how many putative class actions were pending or in the process of being transferred from other courts.

Currently pending before the Court are various motions for consolidation, motions for appointment of lead plaintiff(s) and lead plaintiffs' counsel, and Defendants' motion to dismiss. Having considered the motions, the record in this case and otherwise advised in the premises, the Court finds as follows.

## I. Background

This action has been brought on behalf of all persons who purchased or acquired the common stock of Windmere–Durable Holdings, Inc. ("Windmere") between May 12, 1998 and September 22, 1998, alleging violations of sections 11, 12(a)(2), and 15 of the Securities Act of 1933, as amended, 15 U.S.C. §§ 77k, 77l(a)(2) & 77(o) (1994), and sections 10(b) and 20(a) of the Exchange Act, as amended, 15 U.S.C. §§ 78j (b) & 78t(a) (1994), and Rule 10(b)–5 promulgated by the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5.

Windmere is a manufacturer and distributor of a broad range of personal care products, kitchen electric appliances, and seasonal products for major retailers and appliance distributors in North America, Europe, and the Far East. Windmere's principal place of business is in Miami Lakes, Florida. Windmere President and Chief Executive Officer David M. Friedson, and Chief Financial Officer Harry D. Schulman are also named Defendants, along with NationsBanc Montgomery Securities LLC, the lead underwriter of Windmere's July 22, 1998 public ("shelf") offering of common stock.

As alleged in the Complaint, on May 11, 1998, Windmere announced an agreement to purchase the Household Products Group of Black & Decker, Inc., and that it expected an increase in annual revenue of approximately $750 million. On June 26, 1998, Windmere acquired the Household Products Group for $315 million in cash. In two public offerings effective July 22, 1998, Windmere issued 3,041,000 shares of common stock to the public at $34 per share, and also issued $130 million in 10% senior subordinated notes. All of the net proceeds of the public offers were used to finance the acquisition of the Household Products Group.

On September 23, 1998, Windmere issued a press release announcing that it anticipated fiscal third quarter sales volume and earnings per share to be $30 to $40 million less than analysts' previous estimates. The announcement led to an immediate drop in the share price of Windmere stock. This lawsuit, Case No. 98–2273–CIV–LENARD, was filed six days later.

Plaintiffs allege that during the putative class period Defendants made a variety of misrepresentations of material fact and failed to disclose material facts required to be disclosed. Specifically, Plaintiffs allege Defendants misrepresented certain benefits Windmere could expect from its June 26, 1998 acquisition of the Black & Decker Home Products Group. Plaintiffs further allege Windmere failed to disclose declining revenues in the Latin America division and in certain other segments of Windmere's business. Having purchased shares of Windmere common stock during the class period, Plaintiffs allegedly suffered significant losses as a result of the Defendants' misconduct.

Numerous putative class action complaints were thereafter filed in district courts in New York and Florida, raising the same or similar allegations as presented here. In each of these cases, plaintiffs sought certification as lead plaintiffs, and counsel sought designation as lead plaintiffs' counsel. Because Case No. 98–2273–CIV–LENARD was assigned to this Court on January 20, 1999, and as it is the lowest-numbered among related cases, each was reassigned to this Court pursuant to Rule 3.9 of the Local Rules for the Southern District of Florida. The Court is now faced with choosing between competing claims for class counsel designee and lead plaintiff designee.

The Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, 109 Stat. 737

(1995) (codified as amended in scattered sections of 15 U.S.C.) ("Reform Act") enacted certain guidelines for determining lead plaintiff and class counsel in securities class actions. When multiple persons or entities seek to represent a class, the Reform Act establishes a presumption that such person or entity with "the largest financial interest in the relief sought by the class" is the "most adequate plaintiff" for this purpose. 15 U.S.C. § 77z–1(a)(3)(B)(iii)(I). That plaintiff then may select counsel to represent the class. *See* 15 U.S.C. § 77z–1(a)(3)(B)(v). The underlying rationale is the person or group with the largest financial stake can best prosecute the claims. Moreover, this stakeholder is presumed best able to negotiate with and oversee counsel.

However, once this stakeholder is identified, the Court is charged with overseeing the process, for the lead plaintiff presumption may be rebutted, *see* 15 U.S.C. § 77z–1 (a)(3)(B)(iii)(I), and selection of counsel is subject to approval by the Court, *see* 15 U.S.C. § 77z–1(a)(3)(B)(v). *See also In re Cendant Corp. Litig.*, 182 F.R.D. 144, 145 (D.N.J.1998) (Walls, J.); Geoffrey P. Miller, *Overlapping Class Actions*, 71 N.Y.U.L.Rev. 514, 543–545 (1996).

Faced with competing claims for designation, then, the Court addresses the following issues: consolidation, provisional class certification, provisional certification of lead plaintiff(s), appointment of lead plaintiffs' counsel, discovery, and scheduling matters.

## II. Consolidation

■ Pursuant to Rule 42(a) of the Federal Rules of Civil Procedure and section 27(a)(3)(B) of the Securities Act of 1933 the following cases are hereby consolidated with the above-captioned case:

1. *Jonathan Chariff, Inc., et al. v. Windmere–Durable Holdings, Inc., et al.*, 98–2344–CIV–LENARD (S.D.Fla.)

2. *Gilbert Kunken, et al. v. Windmere–Durable Holdings, Inc., et al.*, 98–2316–CIV–LENARD (S.D.Fla.)

3. *Sherleigh Assoc. LLC et al. v. Windmere–Durable Holdings, Inc., et al.*, 98–2357–CIV–LENARD (S.D.Fla.)

4. *David Licht, et al. v. Windmere–Durable Holdings, Inc., et al.*, 98–2681–CIV–LENARD (S.D.Fla.)

5. *Oakwood Ins. Co. et al., v. Windmere–Durable Holdings, Inc., et al.*, 98–2695–CIV–LENARD (S.D.Fla.)

6. *Concetta Bruno et al. v. Windmere–Durable Holdings, Inc., et al.*, 99–150–CIV–LENARD (S.D.Fla.)

7. *Kam Chu Tam, et al. v. Windmere–Durable Holdings, Inc., et al.*, 99–151–CIV–LENARD (S.D.Fla.)

These cases shall be consolidated with Case No. 98–2273–CIV–LENARD (S.D.Fla.) and shall be administratively closed. All motions pending in each of these cases shall be denied, but leave is freely granted to renew such motions under the consolidated case, No. 98–2273–CIV–LENARD, and shall designate "Sherleigh Associates, LLC and Sherleigh Associates Inc., Profit Sharing Plan," as Lead Plaintiff, for the reasons discussed below.

## III. Provisional Certification of Class and Designation of Lead Plaintiff

Because certain preliminary motions had yet to be ruled upon, several proposed lead plaintiffs in these cases, pursuant to Rule 23(a) of the Federal Rules of Civil Procedure, moved to certify a class of plaintiffs who purchased Windmere stock between May 12, 1998 and September 22, 1998. Provisional certification of this class shall issue pending a final ruling of the Court.

The Reform Act directs "appoint[ment] as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of the class members." 15 U.S.C. § 77z–1(a)(3)(B)(i). Where, as here, a court faces similar class action complaints, such determination is to be made after any motion for consolidation is adjudicated. *See* 15 U.S.C. § 77z–1(a)(3)(B)(ii). The court is then instructed to "appoint the most adequate plaintiff as lead plaintiff for the consolidated actions." 15 U.S.C. § 77z–1(a)(3)(B)(ii). In making this selection, the court is to weigh the financial stake and typicality of interests for each

putative representative, and presume the largest stakeholder best able to represent the class:

> [T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under this subchapter is the person or group of persons that—
>
> (aa) has either filed the complaint or made a motion in response to a notice under [this subpart];
>
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 77z–1(a)(3)(B)(iii)(I). This presumption may be rebutted by a showing that the selected plaintiff will "not fairly or adequately protect the interests of the class," or the existence of "unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 77z–1(a)(3)(B)(iii)(II).

Various motions for designation of lead plaintiff are before the Court. The Court has reviewed the motions and affidavits of stated interests from each putative lead plaintiff. Plaintiff Ralph Casey filed this action on September 29, 1998, and pursuant to 15 U.S.C. § 78u–4(a)(3)(A)(i), caused notice to be published on the Business Wire that same day. As previously noted, several putative class action complaints were thereafter filed in this and other districts. Pursuant to 15 U.S.C. § 78u–4(a)(3)(A)(i)(II), within "60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff." Among those following Casey's lead, Sherleigh Associates LLC and Sherleigh Associates Inc. Profit Sharing Plan ("Sherleigh") filed suit in this Court on October 8, 1998, Case No. 98–2357–CIV–LENARD, within the sixty day statutory period.

■ The Court finds that Sherleigh has the largest financial interest among those seeking lead plaintiff designation. Sherleigh purchased 22,000 shares of Windmere stock during the class period, at approximately $34 per share. Because Sherleigh filed suit on October 8, 1998, within the sixty day statutory period, the Court finds it shall receive the presumption of "most adequate plaintiff" and thus it shall be provisionally designated Lead Plaintiff.

Furthermore, the Court shall provide twenty days from the date of this Order for any other Plaintiff, person, or entity to come forward and attempt to rebut the presumption of designation—based on the grounds of divergent interest, financial stake, or other substantial showing as outlined by the statute.

**IV. Designation of Lead Plaintiffs' Counsel**

■ Having consolidated these actions, provisionally certified this class, and provisionally certified the lead plaintiff, the Court addresses the issue of class counsel. Finding the proposed representation of a consortium of ten law firms not in the best interests of the class members, the Court determines a sealed-bid auction best ensures that class members receive high quality representation at a fair price. The Court therefore sets certain criteria for filing a bid in this matter, and opens the bid process to any interested firm.

**A. Competing Claims Require Balancing of Counsel Choice with Interests of Putative Class**

■ While the Court takes no position on the validity of the claims alleged, early selection of class counsel and determination of their compensation serve the interest of the class by enabling these matters to be resolved competitively. *See In re Wells Fargo Sec. Litig.,* 156 F.R.D. 223, 225 (N.D.Cal. 1994) (Walker, J.) *In re Oracle Sec. Litig.,* 131 F.R.D. 688, 689–90 (N.D.Cal.) (Walker, J.), *modified,* 132 F.R.D. 538 (N.D.Cal.1990) ("Oracle I"); *Cendant,* 182 F.R.D. at 145–46; *In re Amino Acid Lysine Antitrust Litig.,* 918 F.Supp. 1190, 1192 (N.D.Ill.1996) (Shader, J.). Prior to consolidation and transfer to this district, several of these putative class action complaints were filed in other districts. In each case, attorneys filing the actions sought certification as lead plaintiffs'

counsel. Thus, the Court is faced with competing motions for certification.

The Reform Act provides that the lead plaintiff "shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 77z–1(a)(3)(B)(v). Echoing pre-Reform Act rulings of Judge Walker, see, e.g., Wells Fargo, 156 F.R.D. at 224–225, Judge Walls determined in Cendant, 182 F.R.D. at 147, that the Reform Act gives courts not just authority but also responsibility for protecting class interests in counsel selection and compensation. See also 15 U.S.C. § 77z–1(a)(6) ("Class counsel attorneys' fees shall not exceed a reasonable percentage of the amount of any damages [actually] paid to the class.").[1]

A court presented with competing claims for designation and concerned with ensuring quality representation at a fair price is faced with a conundrum: What deference should be paid to the class representative's choice of counsel, as balanced against the court's obligation to the class to ensure such representation is of high quality and is provided at a fair price? See Andrew K. Niebler, In Search of Bargained–For Fees for Class Action Plaintiffs' Lawyers: The Promise and Pitfalls of Auctioning the Position of Lead Counsel, 54 Bus.Law. 763, 764 (1999) (discussing need for reform); and see Manuel for Complex Litigation § 20.22 (3d ed.1995). As several judges and commentators have discussed, "auctioning the privilege to serve as class counsel [helps to] promote price competition across law firms" and ensures that a baseline quality of representation will be maintained at the lowest possible price. See Niebler, supra, at 763; see also Oracle I, 131 F.R.D. at 692–94. In perhaps the first decision to employ such a process in common-fund class action litigation, U.S. District Judge Vaughn R. Walker noted:

[T]he court bears fiduciary responsibilities to the class. Under Fed.R.Civ.P. 23(d), the court may make appropriate orders 'for the protection of the members of the class.' In light of the undeniable non-involvement of the plaintiffs themselves on the matter of class counsel fees or indeed any other aspect of the litigation, this opportunity becomes the obligation of the court.

Oracle I, 131 F.R.D. at 692 (internal citation omitted).

■ The specifics of this case and the proposed representation agreement here militate against awarding lead plaintiff designation to a consortium of ten law firms. See note 1, supra. The Court finds that it would not be in the best interest of the class to award class counsel designation in this manner. Aware of its responsibility to protect the interests of the putative class, the Court further finds that resolution of class counsel designation, determination of compensation, and related representation matters is appro-

---

1. Here, Sherleigh is one of approximately thirteen putative lead plaintiffs designee that appear to be represented by a consortium of ten law firms. (See Mem.Supp.Mot. for Consolidation, Appointment of Lead Plaintiffs, and Approval of Selection of Counsel, filed Nov. 30, 1998, Case No. 98–2273–CIV–LENARD.) When Sherleigh originally filed the putative class action on October 8, 1998, Case No. 98–2357–CIV–LENARD, it was represented by only two law firms, Burt & Pucillo LLP and Pomerantz Haudek Block Grossman & Gross LLP. (See Compl. at 24, Case No. 98–2357–CIV–LENARD.) The first of these similar class action complaints filed, on behalf of Ralph Casey, was brought by the firms Goodkind Labaton Rudoff & Sucharow LLP, Abbey Gardy & Sequitieri LLP, and Law Offices of Curtis V. Trinko LLP. (See Compl. at 32, Case No. 98–2273–CIV–LENARD.) At some point Millberg Weiss Bershad Hynes & Lerach LLP became involved, and the consortium hierarchy was thereafter created. Millberg Weiss seeks to have itself and Pomerantz Haudek designated "Lead Counsel for Plaintiffs and the Class" and also as "Co–Chairs of the Executive Committee;" to have Entwistle & Cappucci LLP, and Bernstein Litowitz Berger & Grossman LLP appointed "Members of the Executive Committee;" and to relegate Abbey Gardy & Squitieri LLP, Stull Stull & Brody, Burt & Pucillo LLP, Goodkind Laboton Rudoff & Sucharow, Cohen Milstein Hausfeld & Toll, and Law Offices of Curtis V. Trinko as mere "Attorneys" for Plaintiffs. (See Mem.Supp.Mot. for Consolidation, Appointment of Lead Plaintiffs, and Approval of Selection of Counsel, filed Nov. 30, 1998, Case No. 98–2273–CIV–LENARD, at 14–16.) Regardless of whether this arrangement constitutes an agreement among the first-to-the-courthouse firms with their later-arriving colleagues to share any potential recovery (and risk of no recovery) in this endeavor, or the affirmative choice of Sherleigh to enter into an extremely complicated representation arrangement, the Court rejects this proposal as not in the best interests of the class.

priate at this juncture.[2] *See Wells Fargo,* 156 F.R.D. at 224–225; *Cendant,* 182 F.R.D. at 145; *Lysine,* 918 F.Supp. at 1192; *c.f. In re San Juan Dupont Plaza Hotel Fire Litig.,* 111 F.3d 220, 232 (1st Cir.1997); *see also* Susan P. Koniak & George M. Cohen, *Under Cloak of Settlement,* 82 Va.L.Rev. 1051, 1277–80 (1996) (discussing court oversight of counsel compensation in mass-tort settlement). To this end, the Court shall employ a sealed-bid auction process.

In drafting the Reform Act, Congress was concerned with the "race to the courthouse" by plaintiffs' lawyers seeking to file the first class action complaint. *See* 15 U.S.C. § 77z–1(a)(3)(B)(v) ("Selection of lead counsel"); John F. Olson et al., *Pleading Reform, Plaintiff Qualification and Discovery Stays Under the Reform Act,* 51 Bus.Law. 1101, 1142–45 (1996) (discussing congressional concerns leading to passage of Reform Act). "The Conference Committee acknowledged that 'courts traditionally appoint counsel in class action lawsuits on a first come, first serve' basis. 'Courts often afford insufficient consideration to the most thoroughly researched, but later filed, complaint.'" *Id.* at 1142 & 1142 n. 9 (citing H.R.Rep. No. 369,

104th Cong., 1st Sess. 31, 44 (1995), reprinted in 1996 U.S.C.C.A.N. 730 [hereafter "Conference Report"])[3] During the hearings leading to the 1995 Reform Act, one prominent plaintiffs' securities attorney "told Congress that a court's decision to award the lead counsel position to the first complaint filed forces plaintiffs' lawyers seeking to control the case (and get a larger share of the fees) to file complaints quickly." Olson, et al., *supra,* at 1142 & 1142 n. 246.[4]

Similar concerns may arise if and when settlement negotiations are considered. Agency problems may develop between plaintiff class members and plaintiffs' counsel. The incentive structure of these two groups may be unaligned, for plaintiffs' attorneys "may seek to maximize their own return rather then their client's return on their litigation investment." Olson, et al., *supra,* at 1143 (citing Conference Report at 18). A court should be aware of these issues, but through case management can address them only in limited fashion.

Determination of lead plaintiffs' attorneys through a competitive process, and early in the litigation, serves to protect the interests of the putative class members and enervate

**2.** The Supreme Court has reasoned that courts must consider adequacy of representation when determining whether a class action may be maintained. Since "commonality and typicality" requirements of Federal Rule of Civil Procedure 23(a) tend to merge, the Court has stated, the requirement that courts assess whether a claim may be maintained as a class action under Rule 23 is intertwined with the assessment courts must make regarding adequacy-of-representation. *See General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) (Requirement to assess whether class certification will be economical, and whether class members will be fairly and adequately represented by class representatives "tend[s] to merge with the adequacy-of-representation requirement, [raising] concerns about the competency of class counsel and conflicts of interest."); *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, ——, 117 S.Ct. 2231, 2251 n. 20, 138 L.Ed.2d 689 (1997) (When court is assessing whether class may be maintained, and whether class representative may fairly and economically represent class members, "[t]he adequacy heading also factors in competency and conflicts of class counsel.") (citing *General Telephone,* 457 U.S. at 157–58 n. 13, 102 S.Ct. 2364).

As the Seventh Circuit has explained, when considering counsel compensation in class action settlements generally, the court's task is to ap-

proximate as closely as possible the attorney selection and fee bargain the class itself would strike if it were able to do so. *See In re Continental Illinois Sec. Litig.,* 962 F.2d 566 (7th Cir. 1992) (Posner, J.) (court's role when determining whether fee is appropriate "is to determine what the lawyer would receive if he were selling his services in the market rather than being paid by court order").

**3.** For further discussion, see Dennis E. Curtis & Judith Resnick, *Contingency Fees in Mass Torts: Access, Risk, and the Provision of Legal Services When Layers of Lawyers Work for Individuals and Collectives of Clients,* 47 DePaul L.Rev. 425, 433 & 433 n. 23 (1998) (discussing problems recognized by conference committee).

**4.** As evidenced here by the multiple filings in several districts, plaintiffs' lawyers have an incentive to file identical complaints to increase their chances of being appointed lead counsel. *See* Elliot J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions,* 104 Yale L.J. 2053, 2063 & 2095–96 (1995) (recognizing counsel incentives may lead to multiple filings).

agency problems which may develop at a later stage.[5]

## B. Auction Theory Addresses Agency Problems and Maximizes Quality/Price Tradeoff

Forging into this little-traveled ground requires some caution, for among the several problems identified with "lead counsel auctions," where factors of quality and price are weighed without adequate consideration to agency problems, the auction may be less efficient than its alternatives.[6] If these problems can be minimized, auctioning the position of lead counsel may well address concerns of judges making *ex post* determinations of reasonable fees and thus creating an uncertain variable throughout the litigation, second-guessing class counsel's litigation decisions, or on the other hand, simply rubber-stamping fee proposals. *See* Niebler, *supra*, at 766–67; *Wells Fargo*, 156 F.R.D. at 225–26.

Therefore, the Court shall accept bids for representation of this putative class separate and apart from any work done on this case to date, by any counsel who has entered an appearance in this or related cases. Because the Court is concerned with fairness and fostering competition among firms, the Court specifically rejects the proposal by certain proposed lead plaintiffs' attorneys that a "steering committee" of all attorneys to date

be appointed. Furthermore, the Court will not allow attorneys who have so far entered an appearance to submit a "joint proposal" to complete the litigation on behalf of the class.

All attorneys who have thus far entered an appearance, in addition to any licenced attorney or firm of attorneys may submit a bid in this matter. As Judge Walker explained in *Wells Fargo*, 156 F.R.D. at 227, firms should be allowed to "spread the risk" or leverage expertise by farming out work; but in the interest of fostering competition, submitting joint proposals will not be allowed. The firm selected as class counsel may refer work to other law firms because of specialized experience, geographic proximity to witnesses or evidence, to utilize any other comparative advantage, or to spread risk. Some very prominent and capable law firms have entered an appearance in this matter already, and nothing in this Order should be construed as an evaluation of any work completed thus far.

■ The decision to award lead counsel designation by auction requires the court to select some method by which to calculate a fair and reasonable fee. *See* Niebler, *supra*, at 770. Among the several methods of remuneration available, the Court is persuaded that a contingency fee arrangement best aligns interests of the class and the attorneys.[7] As one commentator has suggested,

---

5. Even where counsel approval is made on a first-come, first-serve basis, courts are forced to consider these issues during some stage of the litigation—such as during a fairness hearing following a proposed settlement agreement. The Reform Act provides that prior to any settlement, parties who wish to apply to the Court for settlement approval must provide "a statement indicating ... the amount of fees and costs that will be sought ... and a brief explanation supporting the fees and costs sought." 15 U.S.C. § 77z–1(a)(7)(C).

6. *See* Niebler, *supra*, at 764. One commentator breaks down this cost/quality problem by describing four possible law firms that could bid in the auction: low-cost/high-quality, low-cost/low-quality, high-cost/low-quality, and high-cost/high-quality. *See id.* As can be expected, agency problems are greatest with

low-quality firms because these firms are by definition either less skilled at or less interested in maximizing the value of the class claim. On the other hand, agency costs are lower for

both of the high-quality firms because these firms are by definition more able or more willing to maximize the value of the class claim.

*Id.* Thus, "selection of class counsel on the basis of cost alone cannot guarantee high-quality legal services," but price considerations may "provide a tool for crafting the proper incentives." *Id.*

7. This decision is not an obvious one. Problems of asymmetric information cannot easily be discounted. Bidding firms must evaluate the case once the auction is announced, with little information available and little time to investigate. Where courts have decided upon an auction process after consultation with firms, however, problems of collusion have been encountered. *See In re California Micro Devices Sec. Litig.*, 168 F.R.D. 257, 260–63 (N.D.Cal.1996) (Walker, J.); *Wells Fargo*, 156 F.R.D. at 226–27; *In re Oracle Sec. Litig.* 136 F.R.D. 639, 640 (N.D.Cal.1991) (Walker, J.) ("Oracle II"); *Lysine*, 918 F.Supp. at 1192–93. Yet firms that have already begun the "race" by filing early (and often) have a competitive advantage once the auction begins.

the alternatives of utilizing a flat percentage fee arrangement, an increasing fee percentage as the overall settlement increases, or a decreasing fee percentage as the overall settlement increases—each contain agency pitfalls. *See* Niebler, *supra*, at 783–95. These agency problems revolve around a firm's opportunity costs and willingness to invest resources in the instant litigation vis-a-vis other work.[8]

Still, lead counsel auctions can provide both an approximation of the free market process and reduce uncertainties faced by counsel when any *ex ante* determination of fees occurs. *See* Niebler, *supra*, at 774–75. Therefore, while providing guidance to potential bidders and requiring detailed information therein, the Court will not dictate the exact form to which bids must adhere beyond certain minimum requirements, described below. The Court will evaluate bids based on the price-quality continuum, giving appropriate consideration to agency issues. A successful bidder might address not only the minimum requirements, but also discuss these additional issues in some fashion.

█ Therefore, as with the procedure established by the court in *Wells Fargo*, 156 F.R.D. at 224–25, and *Cendant*, 182 F.R.D. at 150–51, the Court shall employ a contingency fee arrangement. Once proposals have been received, class counsel will be selected on the combination of monetary and nonmonetary factors. Specifically, the Court will weigh *both* quality and price of the bid, based on the several factors listed below. The total fee for all counsel in the case will be determined by the successful bid; this fee will be divided among class counsel.

> The court as auctioneer must then evaluate these bids with little information regarding a firm's opportunity costs and incentive structure. When trying to make a qualitative assessment the court has little recourse but to devise a bid process requiring detailed information upon which a good decision can be made.

8. This is because "[a] lawyer who could earn more by investing his or her time in another case would not choose to pursue higher recoveries simply because the lawyer could earn some additional amount of money through additional effort." Niebler, *supra*, at 784 n. 112.

## C. Bid Proposals Accepted and Evaluated based on Specific Criteria

Accordingly, any law firm that seeks to be designated class counsel for claims against one or more Defendants shall submit its proposal for such representation in the clerk's office on or before 4:30 p.m., March 19, 1999 E.S.T., and shall file the bid *ex parte*, under seal. The proposal shall identify each defendant from which recovery is sought and set forth:

(a) the firm's experience in securities class action litigation and the background and experience of those lawyers in the firm who, it is anticipated, will be engaged in representing the class in the present litigation, including the terms and fee arrangements under which such representation took place;

(b) the bona fide qualifications of the firm to complete the work necessary for representation of the class, including the willingness of the firm to post a completion bond or other security for the faithful completion of its services to the class, and the terms of any such bond or security;

(c) the firm's insurance coverage for malpractice;

(d) evidence that the firm has evaluated the case, and the range and probability of recovery, and has premised the bid on that evaluation;

(e) the percentage of any recovery the firm will charge in the event of a recovery as fees and costs for all the legal work performed in connection with the case. This shall include an explanation of the contingency fee arrangement involving a straight, increasing, or decreasing fee per-

> Courts have coupled the percentage of recovery with a qualifier, based on the stage of litigation at which any settlement is realized, such as pre-discovery, pre-trial, etc. *See, e.g., Cendant*, 182 F.R.D. at 151 (utilizing "litigation milepost" grid); *see also infra* Fee Bid Schedule (Appendix A). This process too has pitfalls. For example, a firm may avoid settlement toward the end of one phase of the case in order to gain a higher percentage fee associated with a later-stage agreement, and as defense attorneys likely bill by the hour, little incentive exists on their part to settle early or to otherwise weigh overall class returns.

centage based on the overall amount of recovery through monetary increments and/or stage of recovery at which litigation is reached. To this end the Fee Schedule Grid, affixed as Appendix A below, may be employed;

(f) a description of how expenses and costs shall be borne—whether subtracted from the overall settlement itself, or from the attorney fee award portion, including a justification for this arrangement and the ability of the firm to fund such costs;

(g) A defense of the bid that describes how the fees and cost charges will motivate the firm to adequately represent the class;

(h) a certification on behalf of the firm that (1) its proposal was *prepared independently* of any other firm, entity or person not affiliated with the firm, (2) *no part of the proposal was disclosed* to anyone outside the firm prior to filing with the court and (3) the proposal was *prepared without direct or indirect consultation* with other firms that have filed actions on behalf of the proposed class in this matter, or entered an appearance in any fashion.

For further discussion, see *Wells Fargo*, 156 F.R.D. at 228–29; Niebler, 54 *Bus.Law.* at 831–32.

Additionally, the Court notes that counsel located within this district will not necessarily receive added consideration in this process. Any competitive bid by a law firm located outside of the district, which details how or whether local counsel may be utilized, will be considered. However, this in no way abrogates the duty of any firm submitting a bid to comply with the Court's requirement of independent bidding—local counsel could be designated at a later date. Finally, this Order in no way prevents any individual member of the putative class from hiring the attorney of his or her choice in this matter.

## V. Designation of Magistrate Judge, Temporary Suspension of Pro Hac Vice/Local Counsel Requirement, and Discovery Stay

Magistrate Judge William C. Turnoff is hereby assigned to this case. All pleadings, papers, and filings in this case shall contain the designation of Magistrate Judge Turnoff.

Furthermore, all counsel entering an appearance in this matter are directed to comply with the Local Rules of the United States District Court for the Southern District of Florida and the Federal Rules of Civil Procedure. However, the requirements to be admitted pro hac vice and to designate local counsel by non-members of this Court shall be temporarily suspended for purposes of submitting a bid under this Order. Discovery in this matter shall be stayed pending further order, but all Defendants and defense counsel are reminded of their ongoing duty to preserve relevant documents and discovery material.

## VI. Status Conference

Shortly after the submission of bids, the Court will designate plaintiffs' class counsel. Thereafter, a status conference will be held. Among those matters the Court proposes to discuss are overall scheduling, a briefing schedule to respond to the Defendants' motion to dismiss, and other logistical issues unique to class action securities litigation. The Court will invite the parties to submit matters for discussion before the conference is held. Relevant scheduling requirements of the Federal and Local Rules · shall be suspended until that time.

## VII. Conclusion

Under the guidelines of the Private Securities Litigation Reform Act of 1995, the Court has consolidated multiple filings and designated a Lead Plaintiff in this matter. Faced with competing claims for lead plaintiff designation and lead counsel approval, the Court must protect the interests of the putative class members and balance this interest with the Lead Plaintiff's choice of counsel. Because case management issues unique to securities class action litigation require courts to balance competing interests, under the unique facts of this case, the Court concludes that auctioning the privilege of representing the class best serves these competing interests. Accordingly, it is

**ORDERED AND ADJUDGED** as follows:.

1. The following cases are consolidated with 98–2273–CIV–LENARD and are therefore administratively closed:

1. *Jonathan Chariff, Inc., et al. v. Windmere–Durable Holdings, Inc., et al.*, 98–2344–CIV–LENARD (S.D.Fla.)

2. *Gilbert Kunken, et al. v. Windmere–Durable Holdings, Inc., et al.*, 98–2316–CIV–LENARD (S.D.Fla.)

3. *Sherleigh Associates LLC et al. v. Windmere–Durable Holdings, Inc., et al.*, 98–2357–CIV–LENARD (S.D.Fla.)

4. *David Licht, et al. v. Windmere–Durable Holdings, Inc.*, et al., 98–2681–CIV–LENARD (S.D.Fla.)

5. *Oakwood Insurance Co. et al., v. Windmere–Durable Holdings*, Inc., et al., 98–2695–CIV–LENARD (S.D.Fla.)

6. *Concetta Bruno et al. v. Windmere–Durable Holdings, Inc.*, et al., 99–150–CIV–LENARD (S.D.Fla.)

7. *Kam Chu Tam, et al. v. Windmere–Durable Holdings, Inc., et at.*, 99–151–CIV–LENARD (S.D.Fla.)

All pending motions in each of these cases are **DENIED**. Leave is granted for parties to renew such motions under Case No. 98–2273–CIV–LENARD in accordance with this Order.

2. The Court provisionally certifies a class of plaintiffs who purchased Windmere stock between May 12, 1998 and September 22, 1998. This certification does not constitute a final ruling. Once lead plaintiffs' counsel are appointed, a renewed motion for class certification (and any response) will be considered. All pending motions regarding pro hac vice admission filed in Case No. 98–2273–CIV–LENARD are **DENIED WITHOUT PREJUDICE.**

3. The Court provisionally certifies Sherleigh Associates LLC and Sherleigh Associates Inc. Profit Sharing Plan, as Lead Plaintiff in this matter. Other persons or entities seeking lead plaintiff designation shall have twenty days from the date of this order to file any motion for such certification, in accordance with this Order and applicable law. The Motion by Ralph Casey and other Plaintiffs to be designated Lead Plaintiffs, filed November 30, 1998 is **DENIED** subject to the findings of this Order.

4. In accordance with this Order, any and all firms who wish to represent this provisional class shall submit a bid no later than **4:30 p.m., March 19, 1999 E.S.T.** Bids must be file stamped by the clerk, and may not be filed in the night box. These bids will comply with each directive set forth by the Court in this Order, and will specifically comply with Federal Rule of Civil Procedure 11. No extensions of time will be entertained. **The bids shall be filed *ex parte*, under seal.**

These bids may be permanently sealed or redacted thereafter to protect proprietary information. Furthermore, all attorneys filing a bid in this matter must comply with applicable Local and Federal Rules. Firms are reminded that Local Rule 7.7 prohibits correspondence to the Court. The page length of these Bids should be the minimum required to address the enumerated factors above and the concerns raised in this Order.

5. The motion in Case No. 98–2273–CIV–LENARD by proposed lead plaintiffs' counsel to be designated class counsel, filed November 30, 1998, is **DENIED**. The only pending motions in Case No. 98–2273–CIV–LENARD that survive this Order are Defendants' motion to dismiss, and motion for oral argument, filed January 19, 1999. Consideration of these motions is **STAYED** pending further order of this Court.

6. Magistrate Judge William C. Turnoff is hereby assigned to this consolidated case for all further proceedings.

7. All discovery in this case is **STAYED** pending a further order of this Court. The parties are hereby excused from the scheduling requirements of the Federal and Local Rules pending further notice.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 9 day of March, 1999.

### *CORRECTED ORDER DENYING MOTION FOR RECONSIDERATION*

**THIS CAUSE** is before the Court on the emergency motion for reconsideration of the Court's March 9, 1999 Order, filed by the law firms Hanzman Criden Chaykin Ponce & Heise, P.A., and Pomerantz Haudek Block

Grossman & Gross LLP, on March 16, 1999. The Court having considered the motion, and the record in this case, finds as follows.

The motion for reconsideration shall be denied. The Court has adjudged the proposed representation arrangement of a consortium of ten law firms not in the best interests of the class. Because of the facts of this case, and the history of representation here, the Court finds a sealed-bid auction best balances the interests of the class members with the Reform Act procedures.

When Sherleigh first filed suit in this Court, on October 8, 1998, it was represented by two law firms, Burt & Pucillo LLP and Pomerantz Haudek Block Grossman & Gross LLP ("Pomerantz") (*See* Case No. 98–2357–CIV–LENARD, Compl. at 24.) The Complaint was signed by Michael J. Pucillo, Esq. Prior to consolidation, both Pomerantz and Burt & Pucillo appeared on behalf of other putative lead plaintiffs in separately filed class action complaints.

Then, when the consortium of ten law firms filed the Motion for Approval of Selection of Counsel, on November 30, 1998, these two firms sought to represent each of the putative class members, along with eight other firms. (*See* Case No. 98–2273–CIV–LENARD, Mem. Supp. Mot. for Consolidation, Appointment of Lead Plaintiffs, and Approval of Selection of Counsel, at 14–16, filed Nov. 30, 1998) (hereafter "Mot. Selection of Counsel.")

 Now that the Court has rejected this arrangement and provisionally designated Sherleigh as Lead Plaintiff, two firms, Hanzman Criden Chaykin Ponce & Heise, P.A. ("Hanzman Criden") and Pomerantz seek to claim Sherleigh as their client alone. In the alternative, these two firms seek a "right of first refusal" to match the "lowest" bid once the Court undertakes the selection process.[1]

The Court rejects this proposal. Hanzman Criden has not previously appeared on behalf of Sherleigh, and was not part of the ten-firm consortium. (*See* Case No. 98–2357–CIV–LENARD.) Hanzman Criden represented

Oakwood Ins. Co. when it filed a putative class action complaint in this Court on November 12, 1998, Case No. 98–2695–CIV–LENARD. Pomerantz was proposed as "Lead Counsel for Plaintiffs and the Class" and as "Co–Chair of the Executive Committee" of plaintiffs attorneys, and had previously appeared on behalf of other putative lead plaintiffs in related cases.

The specific facts of this case militate against granting these two firms a "right of first refusal." First, the representation arrangement here is quite different than that faced by Judge Walls in *In re Cendant Corp. Litig.*, 182 F.R.D. 144 (D.N.J.1998). The Plaintiff in *Cendant*, CalPERS public pension fund, was affirmatively represented by counsel, and CalPERS sought lead plaintiff designation with a stated interest of $89 million. *See id.* at 146. CalPERS affirmatively sought to have its counsel designated as class counsel. *See id.* *Cendant* also involved two different sets of class claims. *See id.* There was no proposal that a consortium of all firms representing all proposed lead plaintiffs be allowed to represent the class, and attorneys for CalPERS had not folded CalPERS' affirmative desire to represent the class into counsels' desire to play a role in representing whichever lead plaintiff was eventually designated. In selecting CalPERS, the court stated, "[T]he statutory requirement that lead plaintiff's selection is subject to court approval, indicates that the court should not rely solely on that party's judgment. There are other mechanisms available to the court." *Id.* at 150.

Here, in weighing the dictates of the Reform Act, and carefully balancing the interests of the class members with the proposed representation by the consortium of ten firms, the Court determined in its March 9, 1999 Order that this arrangement is not in the best interest of the class. Hanzman Criden has not previously appeared on behalf of Sherleigh, although it has appeared on behalf of another putative lead plaintiff. Pomerantz folded Sherleigh's interest in serving as lead counsel into its own interest

---

1. The firms do not "seek rehearing of, or challenge" the Court's finding that the proposed representation by a ten-firm consortium is not in the best interest of the class. (*See* Mot. Reh'g, at 2 n. 1.)

in serving as lead counsel for the chosen plaintiff, seeking designation as "Co–Chair of the Executive Committee." These shifts in representation correlate with the perceived interests of the firms involved, not necessarily with the affirmative choice of Sherleigh or the best interests of the putative class members. Therefore, the Court finds that the specific facts of this case weigh against allowing these firms a "right of first refusal" or an additional opportunity to match the best bid.

Second, the Court here utilizes a different bid process than that employed by Judge Walls. In this auction, qualitative factors are to .be weighed along with price considerations. Allowing a first-refusal option would unnecessarily abrogate the Court's duty to carefully weigh the interests of the class. In its March 9, 1999 Order, the Court reasoned that the Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, 109 Stat. 737 (1995) (codified as amended in scattered sec-

tions of 15 U.S.C.) ("Reform Act") allows for the lead plaintiff presumption to be rebutted, *see* 15 U.S.C.: § 77z–1(a)(3)(B)(iii)(I), and requires that counsel selection be subject to approval, *see* 15 U.S.C. § 77z–1(a)(3)(B)(v). The Act further directs that the selection must "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure," § 77z–(a)(3)(B)(iii)(II)(cc) Under Rule 23(d), in class action cases the Court has a duty to protect the interests of the class.[2] To this end, the Court may issue "Orders in Conduct of Actions," and "may make appropriate orders [such as] direct to some or all of the [class] members to step in the action ... to signify whether they consider the representation fair and adequate ... impos[e] conditions on the representative parties or on intervenors ... [or deal] with similar procedural matters." Fed.R.Civ.P. 23(d).[3]

2. Counsel argue that Judge Walker has abandoned lead counsel auctions in the wake of the Reform Act, citing *In re California Micro Devices Sec. Litig.*, 168 F.R.D. 257 (1996). To the contrary, Judge Walker employed an auction process in *Micro Devices* and sought competitive bids. *See id.* at 259. However, problems of collusion were encountered when firms were consulted in advance, and of seventeen firms that originally appeared on behalf of plaintiffs, only two bids were received. *See id.* Deciding to notify the class members of the proposed settlement and reopen the lead plaintiff process to institutional investors who might better represent the class, Judge Walker concluded, "Permitting class counsel who are not effectively monitored to prosecute a class action is the functional equivalent of allowing that counsel to serve as both class representative and class attorney." *Id.* at 260. Counsel also cite *Ravens v. Iftikar*, Nos. C–96–1224–VRW & C–96–1926–VRW, 1997 WL 405110, (N.D.Cal. July 16, 1997) (Walker, J.). This decision rejected a motion for lead counsel designation because of inadequate notice, and has nothing to do with counsel auctions. Finally, Counsel cite a 1991 Eleventh Circuit decision, *Camden I Condominium Assoc., Inc. v. Dunkle*, 946 F.2d 768 (11th Cir.1991) in which the court determined a contingency fee arrangement in common-fund tort claims to be better than a lodestar approach. This case is inapposite. The Court here has determined a contingency fee arrangement best serves the interests of the class and best aligns class counsel incentives.

3. The Court is unpersuaded by Counsel's selected recitation of either the legislative history or the writings of Professor John C. Coffee. The Court provided discussion of Reform Act legislative his-

tory in its March 9, 1999 Order, citing several secondary sources which discuss the history in great detail. The Coffee article cited by Counsel, John C. Coffee, *Securities Class Auctions*, Nat'l L.J., Sept. 14, 1998, at B6, provides suggestions for courts considering an auction process, and concludes "there is room for judicial creativity that the [Reform Act] does not inhibit." *Id.; see also* John C. Coffee, *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L.Rev. 1343, 1454 & 1454 n. 445 (1995) (suggesting certain reforms in class-action settlement) ("[A] minimal reform would require the court to oversee the selection of the plaintiffs' counsel.... The court could, for example, advertise the position by requesting applications to be filed with it. Judge Vaughan walker has used this procedure [and a]lthough auctions pose additional issues, there seems no inherent reason why an attorney must have already filed an action to be chosen lead counsel in a class action."); John C. Coffee, *The Regulation of Entrepreneurial Litigation: Balancing Fairness and Efficiency in the Large Class Action*, 54 U. Chi. L.Rev. 877, 933 (1987) ("One could in theory auction the right to represent the class, awarding it to the attorney willing to accept the lowest fee award. Yet, if price is a signal of quality, the auction may be flawed. The lowest bidder may be a poor quality attorney with the lowest opportunity cost, or the attorney most prepared to settle on a collusive basis against the plaintiff's best interest."); John C. Coffee, *The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation*, 48 Law & Contemp. Probs. 5, 77 (1985) ("[A]n obvious answer to many of the problems discussed in this article would be to auction off the right to bring the suit. The winner in such an auction would have an exclusive property right, would not be

The history of representation in this case, the change in Sherleigh's representation from two firms to a consortium of ten firms and now back to one original and one different firm; the qualitative and price considerations in the bid process; and the need to weigh competing interests, all dictate denial of the motion. However, whether a firm is the affirmative choice of the Lead Plaintiff may be a factor in the qualitative assessment.

As the Court has previously stated, any individual Plaintiff may select the counsel of his or her choice in this matter, and nothing in this or previous Orders should be construed as an evaluation of any work to date

required to share the expected return with the horde of plaintiffs' attorneys who today often appear out of the woodwork once the initial

by any firm that has appeared in this or a related action.

For these reasons, the Court shall not revisit the March 9, 1999 Order. Accordingly, it is

**ORDERED AND ADJUDGED** that the motion by Hanzman Criden Chaykin Ponce & Heise, P.A., and Pomerantz Haudek Block Grossman & Gross LLP to reconsider, filed March 16, 1999 is **DENIED.** All firms are reminded of the requirement of completely independent bidding. This Order replaces the Court's Order of March 17, 1999.

**DONE AND ORDERED.**

action is filed, and would accordingly have a greater incentive to invest in case preparation.")